### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **THOMAS ELIASON** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 24-2534** |
| | : | |
| **ALLIED UNIVERSAL** | : | |
| **SECURITY SERVICES** | : | |

**McHUGH, J.**                                                                                    **July 13, 2026**

### MEMORANDUM

This is an employment case brought against Allied Universal Security Services (Allied), a large company operating at multiple sites with varied requirements.  To ensure that it properly met contractual obligations, Allied adopted a system of compliance codes for every post that it staffed, with data regularly reported to management.  In November 2022, Allied received a tip that Plaintiff Thomas Eliason, a long-tenured employee who was the general manager of its King of Prussia office, had altered company compliance data to cover up persistent instances of noncompliance among his subordinates.  The company investigated and fired Eliason.

This suit followed, and Allied now moves for summary judgment on the remaining claims of age discrimination and defamation.  The core weakness in Plaintiff's case is the serious nature of his infraction.  Despite Mr. Eliason's long service, the conduct leading to his termination—a deliberate effort to hide critical data from company management—is something that would understandably give rise to profound concern.  When the rationale for a company's action makes sense on its face, proving pretext is more of a challenge, and Plaintiff's attempts to discount Allied's rationale here do not suffice to create an issue of fact requiring resolution by a jury. Summary judgment will therefore be granted.

## I.      Factual Record

Thomas Eliason worked for 30 years as a manager for Allied Universal Security and its corporate predecessors.  *See* Eliason Dep. 17:3-10, ECF 54-3.  By the Fall of 2022, Eliason was the general manager of Allied's King of Prussia, Pennsylvania office, responsible for the branch's financial performance and its compliance with legal and contractual requirements.  *See id.* 24:18-25:8.

To manage its large workforce, Allied used a combination of compliance software platforms.  *See, e.g.*, Eliason Dep. 198:22-199:5.  On the main platform, WinTeam, managers could create and edit an entry for each work site, and within each work site, a "post set up" for each security guard post at each site.  *See id.* at 372:10-12.  For each individual guard post, managers would input any legal or contractual compliance requirements as "compliance codes"— for example, where a post required driving, the post set up needed a compliance code requiring a guard with a valid driver's license.  *See* Collum Dep. 67:6:6-17.  A second platform, DOMO, grabbed a snapshot of every post's compliance standards and generated recurring reports.  *See id.* at 27:21-28:9.  These reports went up the chain of command, from managers, to general managers like Eliason, up to the vice presidents and presidents above them.  *See id.* at 65:1-18.  For a manager using this system, the compliance codes for each guard post appeared on the left side of the program dashboard, while on the right side were notification settings to alert branch managers to scheduling conflicts.  *See* Eliason Dep. 195:4-8, 211:21-212:4.

Supervising Eliason was a regional vice president ("RVP").  In 2022, Eliason's RVP was David Collum.  *See* Eliason Dep. 48:11-13.[1]  Collum had come over from a company that had merged with Allied.  *See* Collum Dep. 8:1-3.  After the merger, Allied's corporate executives put a fresh emphasis on compliance in the regional offices.  *See id.* 109:11-17.  Collum testified that Eliason's branch had more compliance violations than any other under Collum's supervision.  *See id.* at 64:15-20.  Collum also recalls that Eliason had expressed concern about compliance in the branch, and that Allied corporate executives had asked Collum about Eliason's branch's issues.  *Id.* at 64:18-65:24.

The issue grew in mid-October, when a security guard from Eliason's branch got into a car accident in a company car, and the company learned the driver did not have a valid driver's license, which the post required.  *See* Eliason Dep. 183:9-19.  Collum wrote Eliason a formal disciplinary notice documenting the incident and gave him until November 15th to audit all driving-related compliance requirements across his branch.  *See* Kowalski Dec. Ex. 1[2] at AUS000464, ECF 54-14 (copy of October disciplinary notice).

The same day he received Collum's written warning, Eliason emailed three of his branch managers that he had reviewed driving-related compliance across their posts and found a "number of [their] people" noncompliant.  *Id.* at AUS000465.  In response, he told the managers

---

[1] From 2019 to 2021, Eliason's supervisor was RVP Joseph Lo Bianco.  *See* Lo Bianco Dep. 7:4-8, 10:4-12, 21:23-22:2.  The record does not show him playing any role in Eliason's firing, but, as discussed below, Plaintiff contends that his negative attitudes toward older workers have relevance as evidence of pretext.

[2] This exhibit, hereafter referred to as "Allied Docs," contains documentation from Allied's files relating to Eliason's firing.

"I deleted your compliance in POST SET UP so it no longer reports these discrepancies to corpor-ate." *Id.*

A few minutes later, Eliason emailed twenty-five of his managers to let them know that he had "recognized large scale issues within the branch on the compliance side of drivers licenses," and that four managers who had gone "into the system to make their updates" had "FAILED THEIR COMPLIANCE AUDIT." *Id.* at AUS000466 (emphasis in original). He explained that "I TOOK OUT ALL OF THE COMPLIANCE REPORTING FOR these 4 managers"        and declared that "FRIDAY IS THE DAY WE WILL GET THIS RIGHT." *Id.* (emphasis in original).

Early the next morning, Eliason emailed his managers again in all-caps:

IMPORTANT NOTES HERE!!!!!!!

DO NOTHING FURTHER WITH YOUR DRIVERS COMPLIANCE – ANY CHANGES THAT YOU ARE MAKING IS BEING SCRUTINIZED RIGHT NOW. EVERY CHANGE IS BEING BROADCASTED ON DOMO      FOR OTHERS TO LOOK AT IN REAL TIME. I DO NOT WANT THIS TO HAPPEN ANY  FURTHER!!!

I WILL Explain everything to you on Friday in  our calls.

ALSO SPECIAL NOTE – DO NOT BRING UP THIS TOPIC AT ALL DURING ANY OF THE WFM CALLS TODAY.

*Id.* at AUS000468-69.[3]  This third email led to concern on the part of one of Eliason's managers, Jeremy Linn.  Linn understood the email to mean that Eliason had removed WinTeam post requirements showing drivers' licenses, so any noncompliant drivers would not appear in reports used to track Eliason's performance.  Linn Dep. 25:19-26:24, ECF 54-5.  Linn feared that Eliason's actions would shift responsibility for noncompliance fully onto the lower-level managers,

---

[3] Eliason testified that "WFM calls" were workforce management calls, meetings that included RVP Collum and Collum's supervisor, the Regional President.  Eliason Dep. 230:1-10.

potentially endangering his job.[4] *See id.*  This motivated Linn to report the emails to the branch's HR manager, Diane Kowalski.  *Id.* at 27:3-10.

Eliason has maintained throughout this litigation that he only switched off the notifications for each post so that he could work with his subordinates without creating a flurry of redundant notifications.  *See, e.g.*, Eliason Dep. 267:1-6.  When asked why he used the term "deleting compliance" and talked about preventing corporate from seeing issues, rather than simply discussing "turning off notifications," Eliason testified that he had a "slip of the fingers." *Id.* 200:9-15, 264:23-265:1.

After Linn reported Eliason to Kowalski, Kowalski opened an investigation and an internal complaint against Eliason.  Allied Docs. at AUS000216-AUS000218.  She first contacted another manager working under Eliason, Steven Hunter, to see if other managers construed Eliason's emails the way Linn did.  *See* Kowalski Dep. 12:20-13:6. According to Kowalski's notes, Hunter provided copies of the emails on the condition he could remain anonymous, and further provided details about when Eliason planned to put the compliance codes back into the posts.  *See* Allied Docs. at AUS000225-AUS000226.

Kowalski discussed the matter with Collum and with her own supervisor, HR executive Adrienne Blanco.[5] *See id.* at AUS000219.  Kowalski also testified that she consulted a matrix of potential rules violations, not contained in the record, which she says pointed to "immediate termination."  *See* Kowalski Dep. 64:20-67:10.

---

[4] Eliason also points out that Linn was on a performance improvement plan imposed by Eliason. *See* Eliason Dep. 294:6-23; Marchegiano Dep. 129:11-22, ECF 54-11.  But even if one assumes that Linn was motivated by retaliation, there is no dispute that Eliason sent the damning emails that Linn disclosed to management.

[5] Ms. Blanco also acted as Allied's 30(b)(6) designee in discovery here.

Collum next met with Eliason to ask him about his emails.  According to Collum's notes and deposition testimony, Collum showed Eliason a print-out of the three major emails at issue and asked him to explain why he sent them.  *See* Collum Dep. 12:10-13*; see also* Allied Docs. at AUS000221-223.   Eliason insisted he simply wanted to impose correct compliance codes throughout his branch without making a mess of the company's notification systems as he sorted the systems.  *See* Collum Dep. 12:18-22.  Eliason denies Collum's version of events, claiming Collum's notes are from an earlier conversation between them, despite the notes' specific references to the deletion of compliance codes.  *See id.* 268:9-278:20.  Eliason described his talk with Collum as very short, with Collum refusing to show him the emails, and Eliason quickly declining to discuss the situation further.  *See id.* at 241:3-246:9.

Either way, Collum's next step was to join Kowalski in talking to Thomas Marchegiano, the branch's Director of Operations, who, according to Kowalski's notes, stated that Eliason had "deleted all codes," Allied Docs. at AUS000228, something Marchegiano confirmed at deposition although he thought Eliason had a "grace period" to correct the branch's posts and put the codes back in, Marchegiano Dep. 243:15-245:7.

Based on the information they had gathered from the emails and conversation, Kowalski and Blanco conferred and agreed that Eliason had committed a fireable offense.  *See* Kowalski Dep. 10:1-16:5, 62:21-65:1; Allied Universal [Blanco] Dep. 53:9-15, ECF 54-8.  Kowalski's notes describe a message from the company's counsel, followed by the term "distorting company data." *See* Allied Docs. at AUS000230.  Collum later testified that he questioned whether the company could keep Eliason around in a lesser role, but agreed with Kowalski and Blanco that "the offense was egregious . . . [Eliason] crossed the golden rule with me, and all my GMs knew it."  Collum Dep. 14:2-4.

On November 8, Allied fired Eliason via a written disciplinary notice. *See* Allied Docs. at AUS000215. Allied handed the King of Prussia branch to Ray Moses, a mid-level manager in his forties who had been manager of Allied's Lehigh Valley office. *See* Moses Dep. 8:6-8, ECF 54-9. Moses testified that when he reviewed the compliance setups for the King of Prussia branch, compliance codes had been turned off across several of the branch's posts, though he could not tell who was responsible or when the codes had been removed or edited. *See id.* 77:18-79:15.

In February of 2023, Allied compiled Kowalski's notes, Collum's notes, Eliason's emails, and other documentation from the firing into a report ("Investigative Report"). *See* Allied Docs. at AUS000219-AUS000220. The documentation includes a copy of the Allied employee handbook, which states that falsification of company records or files, including through careless or improper recording or failure to report errors, can result in immediate termination. *See id.* at AUS000239, AUS000274-AUS000275. Allied added a formal memo explaining their decision-making in addition to the other documentation, *see generally id.*, then placed the combined report onto a shared drive accessible to Allied's HR and legal staff, *see* Allied Universal [Blanco] Dep. 57:12-58:7.

## A. Relevant Procedural History

Eliason has brought four claims in total: (1) age discrimination, (2) hostile work environment, (3) retaliation, and (4) defamation. The defamation claim arose when Eliason first learned, during Kowalski's deposition, that Allied had produced an investigative report documenting his firing.

Allied moved for summary judgment on all four counts. *See generally* ECF 54-1. Eliason concedes summary judgment on the retaliation and hostile work environment claims, contesting only the age discrimination and defamation claims. *See generally* ECF 55.

## II.    Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), and explored by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23 (1986).

## III.    Discussion

Summary judgment must be granted on both remaining counts.  On the age discrimination count, Eliason cannot show that Allied's stated concern about compliance data was pretextual.  On the defamation count, Eliason has no evidence that any defamatory information was published to a third party.

### A.  Age Discrimination

In general, the Pennsylvania Human Relations Act (PHRA) and Age Discrimination in Employment Act (ADEA) both prohibit discrimination based on age.  *See* 29 U.S.C. § 623; 43 Pa. Con. Stat. § 955(a).[6]  Evidence of age discrimination may be direct or indirect.  *See Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001).  Here, Eliason points to no direct evidence. Age discrimination claims based on indirect evidence are governed by the familiar *McDonnell Douglas* burden-shifting framework.  *See Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

The *McDonnell Douglas* framework has three steps.  At step one, the plaintiff must make a prima facie case that the plaintiff is "(1) over forty, (2) is qualified for the position in question, (3) suffered from an adverse employment decision, and (4) that his replacement was sufficiently

---

[6] The laws' texts substantially parallel each other, and so both use the same analysis.  *See, e.g., Colwell v. Rite Aid Corp.*, 602 F.3d 495, 500 n.3 (3d Cir. 2010).

younger to permit a reasonable inference of age discrimination." *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) (citation modified).  If the plaintiff makes this showing, at step two, the burden of production shifts to the defendant to offer "evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997).  If an employer offers such a reason, on step three, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Here, both sides agree there is evidence for steps one and two: Eliason is an experienced worker over forty who was fired and replaced with a younger worker, and Allied has offered a legitimate, non-discriminatory reason for the firing.  Resolution of this motion therefore depends on step three.

Eliason must show that a reasonable finder of fact could find Allied's stated reason is pretextual.  He can do this in two ways: first, he can offer evidence that invidious discrimination is "more likely than not a motivating or determinative cause" of the employer's action; second, he can offer evidence to disbelieve the employer's stated reasons.  *Fuentes*, 32 F.3d at 764–65.

When arguing the employer's reasons are not worthy of belief, the plaintiff does not need to directly contradict the employer's stated legitimate justification.  *Id.*  That said, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.*  Rather, pretext requires showing "*such* [discrepancies] . . . *that* a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765. (emphasis added). This limiting language instructs that not every possible imperfection in an

employer's stated reasons is enough to show pretext. *See also Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 152 (3d Cir. 2017). Where the employer asserts a rationale that makes sense on its face, as Allied does here, the employee's pretext evidence must have some tendency to show that their employer lacked an honest belief in the reason stated and acted for unlawful reasons.

*Fuentes's* emphasis on the quality of evidence needed to raise a material issue of pretext is important here. Eliason focuses on purported imperfections in company policy and its investigatory process, but his critique does not undermine Allied's stated reason for his termination given the severity of his offense. He also tries to show a discriminatory motive based on attitudes expressed by his former supervisor, Joseph Lo Bianco, and the fact that two other older managers were terminated in the years before Eliason's own firing. But this evidence is at best tangentially relevant to his own circumstances, and insufficient to doubt Allied's reason as pretextual.

### 1. Uncertainty in the investigation

Eliason's first argument is that Allied did not confirm the factual basis for his termination, *see* Pl.'s Resp. at 16–21, ECF 55, raising two related points. First, he suggests it is unclear whether Kowalski or Collum made the final decision to fire Eliason, citing a non-precedential Third Circuit decision and a case from this district in which employers' inconsistent explanations around a firing supported findings of pretext. *See Cullen v. Select Med. Corp.*, 779 F. App'x 929, 932 (3d Cir. 2019); *May v. PNC Bank*, 434 F. Supp. 3d 284, 299 (E.D. Pa. 2020).

As a non-precedential decision, *Cullen* carries no weight. *See Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 236 (E.D. Pa. 2021) (McHugh, J). As for *May*, the employer there identified four supposed decision-makers, but only one took responsibility, and he denied speaking to one of the others supposedly involved in the decision. 434 F. Supp. 3d at 299.

Here, any discrepancy is minimal. This is not a case where a person in management is seeking to distance themselves from an employment action. The company's interrogatory responses state that Collum and Kowalski "jointly decided" to fire Eliason. Def.'s Resp. to First Interrogs. at 4, ECF 55-1. Both Kowalski's and Collum's deposition testimony described an investigative process in which HR conducted the investigation and presented a recommendation to Collum as the Regional Vice President, who could agree or disagree with HR's recommendation. *See* Kowalski Dep. 52:24-57:24; Collum Dep. 73:23-74:10. The record does not support the conclusion that Kowalski and Collum disagreed about the firing decision or that Kowalski "overruled" Collum, as Eliason insists. Although Collum candidly admits that he mused about a possible demotion for Eliason, he testified that he ultimately agreed with Kowalski's firing recommendation. *See id.* 75:18-23.[7] Even if Kowalski "overruled" Collum in choosing termination over demotion (something that is implausible given her role in HR and Collum's role as Eliason's supervisor), absent evidence of animus against older workers on Kowalski's part, any disagreement between them does nothing to prove age discrimination. Nor would disagreement over the sanction undermine the credibility of their belief about whether Eliason engaged in misconduct, as any such disagreement would be about the punishment and not a reflection of doubt about the crime.

Eliason's second discrepancy-based argument is that Allied did not sufficiently confirm that he actually deleted any compliance codes, citing the principle that "evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge reasonably could support an

---

[7] Allied also attaches to their reply brief a sworn declaration by Collum that he was the ultimate decisionmaker in the firing. *See* Collum Decl., ECF 58-1. Although I have discretion to consider such declarations under Fed. R. Civ. P. 56(c)(2), I give no weight to it in ruling on this motion.

inference that the employer did not act for non-discriminatory reasons." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 900 (3d Cir. 1987).  Eliason argues it is implausible for Allied to claim an honest belief that he deleted codes without having taken more steps to confirm it to be so.  He first insists that Allied misunderstood his emails, and he only ever turned off notification codes, rather than deleting compliance codes.  *See* Pl.'s Resp. at 17–19.  That distinction matters, Eliason says, because if the compliance codes were untouched, the raw data was never doctored and corporate officers would, ultimately, still get their recurring compliance updates.  *See id.* at 19–20.  Eliason then offers steps he suggests Allied could have taken to prove their belief that he deleted codes, including "examining system logs" and conducting a "post-termination audit."  *Id*.

This theory suffers from multiple weaknesses.  An initial problem is that Eliason points to no evidence that some of his preferred investigatory methods are viable: for example, do the "system logs" Eliason refers to exist, and if so was it possible for IT to check past changes to guards' post set-ups in the way he describes?  The record is silent on these important factual assumptions.

Eliason then asserts that "the dispute is whether he deleted compliance codes or modified branch-level notifications."  *Id.* at 19 n.1.  But on what basis can he, as the employee, define the issues that may be of concern to his employer?  By any measure, the actions Eliason took would have delayed reporting of compliance issues even if the underlying data could be retrieved.  One of his emails explicitly advised managers he supervised that because of his changes the system "no longer reports these discrepancies to corporate."[8]  He simply assumes that turning off notifications

---

[8] In his deposition, Eliason suggests that his email does not mean what it appears to specifically say but should be understood as telling its recipients that *they* were no longer going to get alerts, as comparted to corporate.  Eliason Dep. 200:16-19.

would not be a fireable offense, but Allied has consistently represented that his firing was based on the company's belief that he was hiding important data from corporate officers. Nor is there evidence that the position he advances now was shared with Allied in the moment. By his own account, Eliason shut down his conversation with Collum, and by Collum's account Eliason did not communicate his "notification" narrative. And in his deposition testimony, Eliason admitted that, to a reader, his emails conveyed a message that "'corporate is not going to be able to see this,'" despite the interpretation he now advances. Eliason Dep. 200:16-19.

Eliason even goes so far as to offer a table comparing what the emails seem to say to what Allied concluded they meant. Pl.'s Resp. at 18–19. In one box, the email states "I deleted your compliance in POST SET UP so it no longer reports these discrepancies to corporate," from which Eliason protests that Allied erroneously concluded that he "deleted compliance codes to blind corporate." In effect, Eliason seeks to create an issue of triable fact on the basis that the word "codes" was not in his email. But this exercise in textualism runs up against the Third Circuit's admonition that "pretext is not shown by evidence that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Kautz v. Met–Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005).

Finally, Eliason asserts that Allied never interviewed him, so he never had the chance to tell his side of the story. *See* Pl.'s Resp. at 20. The record contradicts this: while *Kowalski* never interviewed him, Collum did. Granted, Collum and Eliason recall this meeting differently, with Collum describing a meeting with multiple rounds of questions and answers about the compliance

13

codes, confirmed by his notes, while Eliason says he cut the interview short.[9]  Regardless of this different recollection, there can be no genuine dispute that Eliason had an interview and a chance to explain himself.

In sum, Eliason fails to show an investigation so deficient that a reasonable jury could doubt Allied's stated motivations.

### 2. Departures from Allied's policies

Eliason's next major pretext argument is that Allied's investigation was so far outside the company's usual procedures that a jury could find the process "was not designed to determine the truth but to confirm a predetermined outcome."  Pl.'s Resp. at 24.  It can be a sign of pretext when a company makes "a decision foolish, imprudent, or incompetent *by comparison* to the employer's usual mode of operation."  *Fuentes*, 32 F.3d at 765 n.8 (emphasis added).

He advances this argument with yet another table, with one side mapping out the company's standard investigation process, as explained by the corporate designee, Ms. Blanco, and the other side comparing each step to what Eliason claims the company did.  *See* Pl.'s Resp. at 22.  He further argues Kowalski showed bias in interviewing Linn and Hunter, that termination was disproportionally severe, and that Allied made up the charge of "falsification of information." *Id.* at 22–25.

The record does not support as many deficiencies as Eliason claims.  As noted above, Collum interviewed Eliason and Kowalski gathered evidence, even if Eliason believes other forms of evidence may have offered stronger proof.  Eliason emphasizes that Kowalski and Linn were

---

[9] Eliason insists Collum's notes are not from their meeting, *see* Eliason Dep. 268:9-278:20, but rather from some unspecified earlier meeting.  Yet he offers no explanation how that could be so given the notes' references to deleting codes.

"lifelong close friends," and both Linn and Hunter, managers supervised by Eliason, were subject to discipline he imposed. *Id.* at 22. Whatever bias Eliason seeks to insinuate from these facts, they are irrelevant to whether Allied followed its usual investigative procedures. And even if Linn or Hunter harbored a grudge against Eliason, or Kowalski was motivated to avenge her friend Linn, such personal animus does not prove age discrimination.

Eliason briefly argues that termination was a disproportionately severe sanction. *See id.* at 25. Although it may be true that "Kowalski never terminated a general manager without progressive discipline before Eliason," *id.*, in her deposition testimony she made clear that such was the case because she had never previously fired any general manager, *id.* at 25 (quoting Kowalski Dep. 59:16-18). There is no past experience against which to measure.

The fact that there was no written policy specifically saying not to delete codes or turn off notifications also does not show that Allied's decision was "inconsistent with company policy." *Id.* at 25 (quoting *Colgan v. Fisher Scientific, Inc.*, 935 F.2d 1407, 1423 (3d Cir. 1991)). For one thing, as a matter of simple logic, if there is no policy, there is no basis for asserting an inconsistency. For another, it would seem self-evident that manipulating company data would be frowned upon in any workplace without the need for a specific policy prohibiting such conduct. Regardless, the employee handbook included in the HR investigative report includes a promise not to destroy company data, undermining Eliason's assertion that there was no defined rule against "falsification." *See* Allied Docs. at AUS000239, AUS000274-AUS000275. Furthermore, the record contains evidence that the firing was based on an interpretation of company policies, because Kowalski referred repeatedly in her deposition to an HR matrix that influenced her conclusion that firing Eliason was appropriate. *See* Kowalski Dep. 64:20-67:10.

Finally, Eliason argues that Allied showed pretext by producing too little documentation of their investigation.  *See* Pl.'s Resp. at 30.  He points to two district court cases in which pretext existed where the employer produced *no* "contemporaneous internal documents reflecting any meetings, emails, studies, or reports geared toward evaluating [plaintiff]."  *Oliver v. Universal Health Servs. Inc.*, No. 22-4353, 2024 WL 868299, at *7 (E.D. Pa. Feb. 29, 2024) (cited in Pl.'s Resp. at 30); *see also Johnson v. Verizon Servs. Corp.*, No. 16-1023, 2017 WL 1397240 (E.D. Pa. Apr. 18, 2017).  Here, in contrast, Allied compiled the HR report, which includes copies of all the relevant emails, Kowalski's and Collum's interview and meeting notes, the employee handbook, and a formal memorandum explaining their decision.  Eliason does not explain how this amounts to a "documentary void" suggestive of pretext.  Pl.'s Resp. at 30.  If Eliason means to suggest that a three-month gap between the firing and the compiling of the report is not "contemporaneous," he ignores the fact that the critical documents forming the basis for his termination were created contemporaneously and were referenced in the final report.

After reviewing Eliason's global critique of Allied's policy and procedure, the only step Blanco identified that the company skipped was obtaining a written statement from Eliason.  But once again, when determining pretext, "the question is not whether [the employer] conducted the best, or even a sound inquiry, but whether the investigation was a sham, a mere pretext to retaliate."  *Crosbie v. Highmark, Inc.*, 47 F.4th 140, 145 (3d Cir. 2022).  Eliason fails to take the next step and explain how this skipped step tends to show pretext, particularly when he had the opportunity to explain himself to Collum, his supervisor, and the emails he sent forming the basis for his termination largely speak for themselves.

16

### 3. Evidence of discriminatory culture

The rest of Eliason's pretext arguments allege a culture of age discrimination at Allied, reflected by age-related comments made by his former supervisor, Joseph Lo Bianco, and by the company's firing or demotion of two other older managers since 2019.

Eliason does not allege any direct connection between Lo Bianco and Eliason's firing, likely because Lo Bianco had moved to Florida before any of the relevant events in this case and appears nowhere in any timeline of the investigation and firing of Eliason. Rather, he cites Lo Bianco's comments as relevant to whether there was a discriminatory culture at Allied that supports and inference of pretext. The Third Circuit has held that a supervisor's remarks can reflect "a cumulative statement of managerial policies that had been effectuated by other high ranking company executives for a considerable time." *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 132 (3d Cir. 1997). At the same time, it cautioned that not every "ageist statement made by any corporate executive is relevant as evidence of 'corporate culture.'" *Id.* at 133. Rather, there must be some sign that a comment reflects a company's wider culture. *See id.* This includes "factors pertaining to the declarant's involvement in recognizing a formal or informal managerial attitude, including the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action." *Id.*

Here, Eliason relies on the fact that Lo Bianco once called Eliason a "doofus who's let himself go with age" to fellow executive Collum. Collum Dep. 14:20-22. Based on this exchange, Eliason declares that Lo Bianco's comments were "indicative of Allied's managerial attitudes." Pl.'s Resp. at 29. But this is exactly the kind of overly broad argument the Third Circuit warned against, an ageist statement with no connection to any cumulative, longstanding managerial

17

policies.  In fact, the record suggests Lo Bianco's comments were resented by his managerial peers: immediately after Lo Bianco called Eliason an out-of-shape doofus, Collum testified that he pushed back, "I'm older than you, Joe. it's not always about what kind of shape we're in."  Collum Dep. 44:6-9.  Turning to the *Ryder* factors, Lo Bianco cannot be said to hold a critical position in the corporate hierarchy, many months had passed since his departure to Florida and his ageist remarks, and he was not involved in the termination.

Second, Eliason offers that a supervisor's statements can "add color" to evidence of a company's "discriminatory atmosphere," which in turn may be relevant to a pretext analysis. *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 547 (3d Cir. 1992).  To argue Allied had such an atmosphere, Eliason points to Lo Bianco's persistence in mocking older men throughout his managerial tenure.  *See* Pl.'s Resp. at 29–30.  But in *Ezold* itself, the Third Circuit ended up holding that one non-decisionmaker's comments over a span of years, without more evidence, did not tend to prove that the *employer's* decision-making was "infected with discriminatory bias."  983 F.2d at 547.  Significantly, the law firm partner singled out as sexist in *Ezold* was an extraordinarily accomplished lawyer who played a key role in his firm.  If his animus toward a female associate over many years' time was insufficient to represent firm culture, Lo Bianco's far more limited role here does not suffice.

Finally, Eliason argues pretext based on his view that Allied discriminated against other older workers.  *See* Pl.'s Resp. at 25–28.  The Third Circuit briefly acknowledged this theory of pretext in *Fuentes*, observing that pretext might be found where "the employer has discriminated against other members of his protected class or other protected categories of persons."  32 F.3d at 765.

18

Eliason argues Allied discriminated against Thomas Marchegiano when it demoted him for a younger manager in 2019, and against another ex-employee, Kurt Trout, who was fired at Lo Bianco's insistence in 2020. *See* Pl.'s Resp. at 25–27. Eliason believes these firings create a pattern of discrimination when combined with Eliason's own firing, with three older workers fired or demoted within four years. *Id.*

But Eliason's purported pattern of discrimination does not withstand scrutiny. Although Marchegiano was demoted in favor of a younger manager who was in his mid-forties, that younger manager was in turn demoted to make way for Lo Bianco, who was in his late fifties at the time. *See* Marchegiano Dep. 220:22-221:6. Allied argues that this is the inevitable shuffling of a large corporation that frequently merged and reorganized, not an indicium of discrimination. *See* Def.'s Reply at 17-18, ECF 58. It further points out that the company employs over ten thousand workers in Pennsylvania alone, with three employment actions over the span of three years providing little basis for establishing a pattern of discrimination. This comports with the Third Circuit's past guidance not to consider "evidence of the more favorable treatment of a single member of a non-protected group . . . in a vacuum." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998).[10] Given the context, there is little evidence on which a jury could reasonably rely that Marchegiano's demotion constituted an instance of age discrimination relevant to Eliason's termination.

---

[10] "[At the pretext phase] there still must be evidence from which to infer discrimination apart from the fact that some members of one group are sometimes treated better and sometimes treated worse than members of another group. . . . the plaintiff cannot pick out one comparator who was not demoted amid a sea of persons treated the same as her" to establish a jury question." *Simpson*, 142 F.3d at 646 (citation modified).

As for Kurt Trout, Eliason claims "Allied engaged in a pattern of assigning disproportionately difficult accounts to Trout during the COVID-19 pandemic" as a way of forcing Trout to earn costly overtime, while assigning easier, less time-intensive work to a manager in his late 30s or early 40s. *See* Pl.'s Resp. at 26–27.

In contrast to Marchegiano's situation, Trout's testimony, drawn from his deposition in his own lawsuit against Allied, describes the kind of circumstantial evidence that *Fuentes* held can support a finding of pretext. *See* 32 F.3d at 764–65. But the potential force of this evidence is limited. To the extent Eliason pins Trout's firing on Lo Bianco, *see* Pl.'s Resp. at 27, he makes it harder to claim that Trout's case should be taken as evidence of Allied's motivations in his own case, both because Lo Bianco was not involved in Eliason's firing and, as discussed above, Lo Bianco cannot be viewed as representing the company's views. Moreover, Trout was fired because of lack of productivity after Lo Bianco allegedly assigned him problem accounts, whereas Eliason was fired for cause. The combination of Lo Bianco's involvement and different underlying circumstances provides an insufficient basis for a jury reasonably to conclude that Trout's termination is sufficient to establish pretext in Eliason's termination.

In the final analysis, adverse action against three members of the protected class out of a workforce of more than ten thousand employees does not establish a pattern of discrimination, particularly when only Trout's firing can be directly linked to expressions of ageist bias.

**B. Defamation**

Eliason's other remaining claim asserts that Allied defamed him by producing an investigative report about his firing, which it placed it in a folder where the company's legal and HR staff could access it. *See* Third Am. Compl. ¶¶ 69–92, ECF 42. This does not constitute the kind of "publication" required to make out a defamation claim under Pennsylvania law.

20

Pennsylvania's defamation cause of action is codified at 42 Pa. Cons. Stat. § 8343(a). It requires a plaintiff to show "(1) that the statement was defamatory; (2) that [Allied] published it; (3) that the statement was about [Eliason]; (4) that readers would understand the statement as defamatory; (5) that readers would understand that the defamatory statement was about [Eliason]; (6) that the publication harmed him; and (7) that [Allied] lacked a 'conditional privilege' to make that statement." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020) (citation modified).

The second element, publication, requires the defendant to perform some intentional or negligent act to pass on the information. *See, e.g.*, *Summit Hotel Co. v. Nat'l Broad. Co.*, 8 A.2d 302, 308 (Pa. 1939). Importantly, the defendant's actions do not amount to publication until a third party actually receives the information. *See Gaetano v. Sharon Herald Co.*, 231 A.2d 753, 755 (Pa. 1967).

For that reason, the Third Circuit has held that putting an HR report in an HR file does not constitute publication. *See Cooley v. Pennsylvania Hous. Fin. Agency*, 830 F.2d 469, 473–74 (3d Cir. 1987), *abrogated on other grounds*, *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207 (3d Cir. 1991). Without evidence of "actual dissemination" of a termination letter beyond placement in the employee's file, the Circuit held that "it cannot properly form the basis for a claim that petitioner's interest in his good name, reputation, honor, or integrity was thereby impaired." *Id.* (internal quotations omitted). Here the Report was stored in a company digital folder with restricted access, a level of privacy analogous to the paper file in *Cooley*. The act of putting the report there is not enough of an act of publication, as long as there is no evidence that the report saw any actual dissemination outside the company.

Eliason argues that simply making the report available to members of the HR and legal departments amounts to publication. But he cites no authority for such an interpretation of Pennsylvania law, and its appellate courts have specifically held that there is a conditional privilege that applies "to private communications among employers regarding discharge and discipline." *Miketic v. Baron,* 675 A.2d 324, 329 (Pa. Super. Ct. 1996); *see also Daywalt v. Montgomery Hosp.*, 573 A.2d 1116, 1118 (Pa. Super. Ct. 1990) ("incidental publication" to employees involved in human resources issues is privileged). That privilege can only be overcome by malice, and Eliason fails to point to sufficient evidence of malice here. Somewhat ironically, in arguing pretext, Eliason faults Allied for an insufficient investigation, but then he separately seeks to impose liability for its having investigated and documented its findings and conclusions in writing. To declare that mere preservation of such records represents the publication of defamatory statements would turn routine, albeit sensitive workplace investigations into minefields of defamation liability.

Pennsylvania courts have further held that publication requires proof of "actual communication, more than a presumption of communication." *Steinhauer v.* Wilson, 485 A.2d 477, 480 (Pa. Super. Ct. 1984). Even if Allied employees with access to the report counted as outside parties for publication purposes, there is no evidence that any of them ever read the report. In addition to undermining any claim of publication, this fact makes it even harder for Eliason to causally connect the Report's contents to any difficulty Eliason had finding a new job. Eliason fills this gap with speculation: everyone in the office knew that Eliason's firing had something to do with deleting codes, and "they must have heard it from somewhere," so it would be reasonable for a jury to find that Kowalski or someone else spread the report's contents around, eventually reaching potential employers. Pl.'s Resp. at 36–37. But in *Cooley*, the Third Circuit held that it

was not the employer's burden to "negate" that there was "dissemination" to prospective employers.  830 F.2d at 475.

Turning to the record, the deposition testimony Eliason cites gives no sense of how and when others in the office learned about his firing.  There are multiple possibilities, starting with the two managers who were interviewed, Marchegiano, as well as anyone who got Eliason's emails, then saw him get fired within a few weeks.  Members of the office necessarily learned about the firing from somewhere, but it does not follow that the only or even likely source of their knowledge was the investigative report.  "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

In the absence of evidence to support necessary elements of Eliason's defamation claim, summary judgment is warranted.

## IV.    Conclusion

Mr. Eliason's termination after so many years of service is deeply regrettable, as is his struggle to find other employment.  But despite voluminous discovery, evidence is lacking that Allied fired Eliason because of his age.  For the many reasons discussed above, Defendant's Motion for Summary Judgment will be granted.  An appropriate order follows.

  /s/ Gerald Austin McHugh
United States District Judge